Fundamentally, from our perspective, the issue in this case, the public policy issue in this case, is whether small business community pharmacies are going to be allowed to survive and flourish through fair competition or if they are going to be bulldozed out of business through unfair competition. Small business community pharmacies, like other small businesses, are supposed to succeed by creating and nourishing relationships with their customers. They can't do that when they are barred from providing ongoing services by self-dealing agents of an insurance company. Can't they just negotiate a different contract next time? Well, I think that's what I'm getting to. My point is that the contract they negotiated here is supposed to protect them from what's going on. So what is the language in the contract that does that? Where would we find it? The most basic language is the language that requires Express Scripts, the defendants, to comply with HIPAA, essentially creates a contractual right of action when there's a violation of HIPAA. A contractual right to enforce a federal law? A contractual right to require compliance. On behalf of patients? No, on behalf of itself. No. I mean, HIPAA doesn't care about the pharmacy, it cares about the patients. That may be. That may be. But the question then is, it isn't whether Congress, when it enacted, and that's what this Court decided, by the way, in the Iconico case, the question isn't whether when Congress enacted the statute, when they enacted HIPAA, it was intending to protect patients or was intending to protect pharmacies. It doesn't matter whether Congress was intending to create a private right of action under HIPAA. What this Court said in Iconico, and in other cases, is the question is whether Congress intended to prohibit state law private rights of action, and here we're talking about a state law private right of action under contract. In other words, what is it about the law that says that a party who benefits from the enforcement of a statute that it isn't necessarily intended to be protected by? What is it about the law that prohibits it from entering into a contract with another willing party, a private contract, where both parties agree that they're going to comply with that law? What is it about HIPAA that prohibits parties from entering into a contract like that? There isn't anything in HIPAA that prohibits parties from entering into a contract like that, and that's what they did here, and that's what this Court essentially found in Iconico. The question is, does the statute prohibit the enforcement through other means? So what section of HIPAA are you claiming they violated? Okay. So it's two, and ultimately HIPAA obviously is the implementing regulations that we're talking about. So the first one is 45 CFR section 164.508, subdivision A, which says that when a covered entity, express scripts, obtains or receives a valid authorization for its use or disclosure of protected health information, such use or disclosure must be consistent with the authorization. And the second, and more importantly, I think here, is 45 CFR section 164.504, G2, which says that a covered entity that performs multiple covered functions, so that would include providing health care, clearing house services, providing health care, or acting as a health care provider. Those are two different covered services. When a health care, excuse me, when a covered entity performs multiple covered functions, it may use or disclose the protected health information of individuals who receive the covered entity's health plan or health care provider services only for the purposes related to the appropriate function being performed. What we're saying here is that express scripts receive the information that we're talking about, it's customer information, customer data, when performing a function as a clearing house. It then converted that information and used it in its capacity as a health care provider, which is a different service, a different function, and HIPAA prohibits that. And ultimately, that's really the way we've plugged... What forum has ever come close to embracing that interpretation of the regulation? Have you got a guideline, have you got a reg, have you got an agency decision, have you got a court decision? I can't believe it, but I can believe anything. So I actually think this is an issue of first impression. That's all the more reason not to embrace this extraordinary interpretation of the contract provision. You're inviting or requiring a federal court acting way outside the parameters of the statute and its implementation and enforcement to adopt a most strained interpretation of the subdivision. I'm not sure that it is strained, though. It is. Sorry. Well, I mean, you've just explained it, and as you've explained it, it's strained. Related to can include the refilling of a prescription. No, but the regulation that I'm referring to, that 164.504G2, that's the one that's covered. What that deals with is when an entity performs multiple covered functions, which is what we're talking about here. One covered function as a clearinghouse, one covered function as a healthcare provider, in other words, providing mail order prescriptions. Those are two distinct functions under HIPAA. And then what HIPAA specifically says is that when a covered entity is performing more than one function, when it receives information for one. I hear you. I just say it's on its face to me absurd. The interpretation of the reg you're urging or the application of your interpretation of the reg to me is absurd. Well, I think that you might be right if we only had the regulation to rely upon. But the issue here isn't whether these plaintiffs can sue to enforce a HIPAA regulation. That's not what they're doing. They're suing to enforce their contract. But your clients acting at the behest of the patients that HIPAA is meant to protect can get indirectly a contractual benefit out of a provision meant to protect the patients. No. I'm arguing that these plaintiffs, these pharmacies, can enforce a contract provision that they to comply with HIPAA. They're not enforcing the regulation. They're enforcing their contractual rights. Okay. I hear you. And as I was saying, I think the Iconico case and other cases really stand for the very basic proposition that when you're talking about can parties to a private contract or can parties under state law enforce rights that may exist in federal law, the question isn't whether the federal law provides those rights itself. But it's much different if it's their rights under state or federal law. Here you're using a contractual provision to enforce for your client's benefit rights intended for others. I don't fully agree, but let me refer the Court then to the ABF case, this Circuit's decision in ABF Freight Systems, which was a case that dealt with a multi-party contract. It was a collective bargaining agreement that, among other things, provided for minimum working conditions for employees. Those provisions of that collective bargaining agreement were clearly there to protect the employees. That's why you have working conditions requirements. But this Court said that because ABF Freight Systems also benefited from the enforcement of that provision and had a contractual right to enforce that provision, it didn't matter that the provision wasn't specifically intended to protect it. All that matters under the law is whether it has a right, a basis to enforce a contract and whether it has an injury, in fact, if the contract isn't enforced. Or in this case, the question is, do these plaintiffs have a contractual right to enforce? They do. They have a contractual right under Section 5.3 of their contract to require compliance with HIPAA. And then the question that follows after that is, are they injured by the breach of that contract? And here they are. That's the whole point. So the question isn't, does HIPAA protect them or is HIPAA designed to protect them? The question is, are they injured if their contract is breached? And what's going to be the remedy? What? Excuse me? What would the remedy be? Damages for the lost prescriptions, for lost business. And then I just want to quickly touch on one other thing, and then I'd like to reserve the rest of my time unless the Court, of course, has further questions. The breach of the covenant of good faith and fair dealing. And what that really boiled down to here, at least in the district court, was whether the contract expressly permitted Express Scripts to do what it did here. And it doesn't. It clearly doesn't. The reason the district court decided that it did was because there's a… It's not only express. Either expressly provides or expressly does not provide. Either one would cut off a covenant claim under Missouri law. Well, except that under Missouri law, the breach of the implied covenant claim can be brought when a party is engaging in conduct that deprives the other party of its intended benefits under the contract. And that's what we're talking about here. What case is that? What Supreme Court of Missouri case is that? Let me find it. It's actually a decision by this Court. It's the Owen v. General Motors Corporation case. It's cited in our briefs. Relying on Missouri law? Decided under Missouri law. And so the district court here decided that because the pharmacy provider manual, which is arguably incorporated into the contract, excuse me, because the contract, the party's contract, references mail order, and according to the district court suggests that Express Scripts is providing mail order services, that this conduct is permitted by the contract. And I would just argue, as we've argued in our briefs and so I won't belabor it here, that that's not what the contract says. What the contract says, or at least a reasonable interpretation of the contract, which would then create an issue of fact or a mixed question of law and fact, which can't be decided on motion to dismiss, is that that provision merely says that Express Scripts manages or administers mail order pharmacy networks, meaning it's not itself providing mail order services, but it's acting as an administrator essentially to manage mail order, just as it's managing pharmacies like plaintiffs filling prescriptions. So our view is that our interpretation is the correct one, but even if the defendant's interpretation or the district court's interpretation is a reasonable one, they're both reasonable and it's a question of fact or a mixed question of law and fact that shouldn't have been decided on a motion to dismiss. And you raised seven different claims. Are you relying on all of those here on appeal as well? Yes, I just refer to my briefs on the others. These are the ones that I thought were worthwhile focusing on. Well, I find it interesting that you stated at the outset the policy issue here is should your clients be protected from unfair competition, and you have not discussed any claim that interprets and enforces unfair competition. It's a fair point. And so what I would point out is that the unfair competition claim here, because we do have a claim for unfair competition, really boils down to its – Any antitrust claim is the same. There are antitrust claims as well. I assume that's within the panoply of your reference to unfair competition. It is. It is. The common law unfair competition claim, it's really joined in many ways with the contract claim, or at least the issues are very similar. The question is essentially whether these plaintiffs and pharmacies – The breach of contract is not an actionable tort of unfair competition. No, I agree. I agree. The intertwining makes no sense. What I meant by that was that ultimately the question on the unfair competition claim is whether the contract permits Express Scripts to do what it's doing. If it does, then there probably is an unfair competition claim. But if it doesn't, then the information and data that we're talking about is – It still has to be unfair. It does. Okay. I haven't heard why it is. It's the use of the plaintiff's trade secret information, their customer information, their customer data. It's not trade secret information. It's information owned by Express Scripts, and it's not a trade secret anyway. It isn't information owned by Express Scripts. That's the contract you're relying on. That's what the contract says. The contract doesn't say that. What the contract says is that information that Express Scripts derives from the processing of claims is owned by Express Scripts. I thought it said the information submitted by the plaintiff. It does not. It specifically does not say that. It says the information derived from the information provided by plaintiffs. I still don't understand the unfair competition. What is unfair about – I mean, I understand the unfair result from your client's perspective, but I don't understand the unfair competition. What makes the competition here unfair and actionable is that these plaintiffs are required to provide certain information for a certain purpose, and that information they're required to provide is their information that's owned by them. But you're viewing the landscape, in my view, much too narrowly. Isn't the client of Express Scripts – are the ERISA and other health insurers operating in the patient's interest to procure cost-effective and efficiently drug stuff? Now, I assume that Express Scripts would not be refilling prescriptions, would not be coming up with a program to do that, without the blessing of their clients on behalf of the patients who you say are the real injured parties here. They aren't. I have to assume that the patients probably love this because automatic refills by mail get them what they need fast and presumably cost-effectively. If it's not cost-effective, somebody's going to do something about it, and it's going to be the plaintiff's administrators. But the problem is that in a motion to dismiss, we can't assume any of those things. Those things are all outside of the pleading. You have to assume the real world. Yeah, and the real world here is that there's a participant in this transaction which holds substantial market power over essentially every other participant in the transaction, including the insurance companies, and that's Express Scripts. That's not plausible. It is. Express Scripts – we have nationwide health insurers and ERISA plant administrators with substantial potential market power and certainly the ability to walk away. The issue is they don't have the ability to walk away. Express Scripts is a $50 billion company. The benefit manufacturers, the pharmacy, the plant administrators don't have a choice? Because there are only three or four of these companies like Express Scripts. We've got a lot of industries with only three or four big players, and that's a competitive market. That's fair. Take beer. Everybody in St. Louis knows that beer is pretty oligopolistic. It can be, except they're – And the antitrust enforcers watch a lot about competition, but it's not considered monopolistic. You can have attempts to monopolize an industry like beer or probably this industry, but you've got to prove it. It's not unfair competition until you do prove it. And I think we have to have an opportunity to prove it, which we haven't been allowed here. Because you didn't plead it. Well, we pleaded it. If you didn't plead it, you don't get – you aren't halfway to first base, so to speak. Then if the answer is it wasn't sufficiently pled, we should have been allowed an opportunity to amend rather than dismissed with prejudice. No, no. It's not arbitrariness. It's prudence. I understand, although we did ask for an opportunity to amend here. Did you submit a motion with an amended complaint? No, we asked for it in the opposition of the motion to dismiss. And we have a lot of cases saying that's not – that doesn't do it. I understand. But, again, that wasn't the ruling of the district court. The ruling of the district court wasn't here. It wasn't that the pleading wasn't adequate. It was the contract prohibited these things. Mr. Boucher, you're about to eat up your rebuttal. I'd like to reserve the rest of my time. Thank you. Mr. Holliday. Thank you, Judge Smith. May it please the court, I'm Phil Holliday, and I'll be making the argument on behalf of the express scripts defendant this morning. I'd like to start right where Mr. Bowles finished and just make clear they did not request any opportunity to amend their complaint as part of their opposition to our motion to dismiss. Counsel, would you direct your voice towards the mic? They did not plead or ask for an opportunity to amend their complaint as part of their opposition to the motion to dismiss before. But to the fundamental points here, the district court got it right in granting express scripts motion to dismiss. Did they move for reconsideration? They did not move for reconsideration, Judge Logan. So there's no pleading where we'd find a request? No pleading until the reply brief in this court for the first time they throw up as a hail Mary, we should have been allowed to amend our complaint. But back to the fundamental point, because as your honors have indicated, HIPAA's primary purpose is to protect individuals' private health information, not to ensure that pharmacies participating in retail pharmacy networks get paid. Judge White correctly held that the pharmacy plaintiff's breach of contract claim fails both because no private right of action exists for a HIPAA violation and more importantly, because it is the individual member's authorization, not the pharmacy plaintiff's interest in getting paid, that determines how a plan sponsor's member's PHI can be used by express scripts. Counsel, is there a distinction between having a contractual right to enforce one's obligation to comply with what you've agreed to do if what you've agreed to do is to comply with the law? Your honor, I don't think this court has to resolve that finally today, but I will say this, we have cited cases in our brief that support the proposition that what you're talking about is simply a compliance provision, that both parties are required to do something they're already required to do under the law, that that is not an enforceable contractual right. But even for purposes of today, and by the way, the plaintiffs have cited no case in the context of HIPAA that would suggest that you have a right to enforce a compliance provision that way. But even if you could come up with some scenario where there were facts in which a party could attempt to enforce or bring an alleged breach of contract action based on a violation of a compliance provision in the contract, this is not that case. And it's not that case because of whose authorization controls. It's the plaintiffs. It's not the plaintiff's pharmacy who get to dictate how the PHI information that they provide to express scripts is used. When that member walks in to one of these plaintiffs' retail pharmacies and pulls out his or her express scripts card and hands it to the pharmacist so that they can get their prescription filled, they're not doing that so that the plaintiff's pharmacies get paid. They're doing that so that express scripts can provide their prescriptions consistent with and in accordance with the terms and conditions of the plan sponsor's prescription drug programs. And that's exactly how, taking everything in plaintiff's complaint as true, that's exactly how express scripts has used the information here. They have, in every instance, whether they are filling the prescriptions through the retail pharmacy network or through mail order dispensing, simply used the prescription information provided to provide the individual member. We're at 12B6 here. Yes, sir. Sorry not to talk facts, but we're limited to what we can talk. Was it alleged to the contrary? No, sir. In the complaint? Nowhere in the complaint was it alleged that express scripts somehow used the PHI information they got to do anything that violated the plan sponsor's prescription drug programs. In other words, fill the prescriptions as provided in the terms and conditions of those prescription drug programs. Now, in your view, what claims does that failure to plead affect? I think it, one, is dispositive of the alleged breach of contract claim, plain and simple. And then, two, when you look at the agreements themselves, and there are two agreements that are in play here. There's the pharmacy provider agreement, the PPA, and there is the provider manual, which is specifically referenced throughout the PPA. And section 7.3 of the PPA specifically references that the provider manual along with the PPA constitute the agreements between the parties in this case. When you parse through those, and the pharmacy provider manual is admitted over 100 pages long and takes some time. But Judge White carefully parsed through the provider manual and the PPA. And he concluded, one, and most importantly, that those terms and conditions are not ambiguous at all. And that is the role of the trial court, is to determine whether or not. . . Well, that's an issue of law. It is an issue of law. Under current law. That's exactly right. And so he did exactly. . . We can review it de novo. I'm not sure we've been asked to. I don't think you have to, but I'll tell you what Judge White found when he reviewed it. He found, one, that it's unquestioned under those two agreements that Express Scripts has the right to use members, PHI, in fulfilling its obligations to its plan sponsors and their members. Two, that Express Scripts will fill certain prescriptions by mail dispensing. And three, that the plan sponsors and their prescription drug programs determine the methods by which the prescriptions will be filled. And that's why it's so critical here that nowhere in the complaint does it allege that at any time in filling any prescription, whether through the retail network or the mail network, that ESI fail to do so in compliance with and in accordance with the terms and conditions of the plan sponsors' prescription drug programs. So because they were specifically authorized to use the information as they did, Your Honor, I think that knocks out all the quasi-contractual claims here, as well as the breach of contract claims. And I would include in those everything but the monopolization claim that Your Honor referenced at the end. So I think all those claims are gone based on the members' authorization here to have their prescriptions filled consistent with the terms and conditions of their plan sponsors' prescription drug programs. And the quasi-contractual stuff is gone because of the express terms and conditions of the two agreements. As an aside, I think I saw a reference in the last week that the Supreme Court granted cert on an Eighth Circuit decision involving pharmacy benefit managers. If you're familiar with it, would you give us an alert? Does that case potentially have anything to do with this one? I'm not involved in that case, and I don't know the specifics, but I am told by those who would have some knowledge that it has no bearing on the issues that are before this Court. But you are correct, cert was granted in a case last week, but it doesn't deal with the claims involved here. Can you go back, just to make it clear, what provision of the agreement between Express Scripts and these pharmacies allows Express Scripts to, and I think you say expressly allows, to use the information in its own mail-order pharmacy business? I think what I meant to say, that they are expressly allowed to use the information consistent with the terms and conditions of their plan sponsors' prescription drug programs. And that's what the agreement says? That's what the agreement says, yes, sir, and I can cite several for you. I mean, just at the outset, there's no question that mail dispensing is permitted under the PPA and the provider manual. That's in the very first recital where it says that Express Scripts administers and manages prescription drug programs for its sponsors, which programs include claims administration, mail service dispensing, and other pharmacy benefit management services. Well, that just says that they do it. They do it, yes, sir, but then there are multiple provisions within the agreement and the provider manual. For instance, Section 2.2 of the PPA, provider shall provide services here under, including the dispensing of covered medications, in accordance with applicable prescription drug programs and the design and formulary applicable to the specific prescription drug program. You turn over to Section 5.1 of the provider manual and it reads as follows. Express Scripts provides clinically sound formularies, which when combined with well-designed prescription drug benefit plans can help decrease a sponsor's prescription drug cost because no single formulary Is the provider manual incorporated into the PPA? Section 7.3 specifically of the PPA references the manual and notes that it constitutes the entire agreement between the parties. In addition to that, Judge White cited in his opinion  that have consistently held that the provider manual is incorporated into the terms of the PPA. In their complaint, did they cite any particular section of HIPAA that they claim to be violating? I do believe they cited the section in 508 that Mr. Bowles referenced earlier today. But not the 504G2? I thought at 164, I thought he started with 508A. He might have, but I think he also talked about 504G2. He did, and I think that what your honors picked up on right away was the final clause in both of those which provides in the case of 508A consistent with the authorization and the provision in 504G2 which says related to appropriate functions being performed. So those two provisions are out there. There's nothing about the way that Express Scripts has used the PHI they were provided that is not consistent with providing prescriptions pursuant to the plan sponsors plan. You mean as alleged? I'm sorry? As alleged you mean? As alleged, yes sir. There's nothing as alleged that's a violation. And more importantly I would point out, your honor, that 45CFR164502A1l2 is also applicable here and specifically provides that a covered entity like Express Scripts is permitted to use and disclose the PHI it receives for treatment, payment, or health care operations as permitted by and in compliance with 164506 which in turn provides that a covered entity may use or disclose PHI for its own treatment, payment, or health care operations. There's no allegation here that the PHI has been used in any manner other than in connection with health care operations. Under G2, you'd concede that Express Scripts performs multiple covered functions, right? I would concede that. But you're saying that simply doesn't matter. I'm saying that the way they're using it is consistent and permitted under both those covered functions. Yes, sir. That's exactly right. But again, the real fault of the complaint here as it relates to the contractual and quasi-contractual services is that there's no allegation that Express Scripts has used this PHI information in any manner  that is consistent with their plan sponsors' plans. Plain and simple. End of story. I will say that, Judge Logan, I think you're exactly right that this information couldn't possibly be a trade secret. Keep in mind... Couldn't possibly be what? ...be a trade secret. The reason that these customers are coming to the prescription pharmacies in the first place is because... It is, and also they know that these pharmacies have signed on with Express Scripts. If they didn't sign on, if they didn't plan, if these retail pharmacies didn't have an agreement with Express Scripts, the patients couldn't come there in the first place and get their prescriptions filled. And again, the information they're providing, Express Scripts already has. I think one of the briefs says that the plaintiffs learned about this when people came in to get their refill to the pharmacy and were surprised that it had been done by mail order. That's a naked allegation in the complaint. Was there a response to that in your motion papers? Our response in our motion papers, we did not specifically address it because we were... That's fine. ...confined by what's in the record. But it's a fact we have to assume is true. It is a fact you have to assume is true, but the reason we say that it does not matter here is because the information is being used consistent with the authorization, the authorization being to fill our prescriptions consistent. I understand the response on the claims. Got it. Let me spend a minute on the Sherman Act... Yes, sir. ...claim which you concede is not foreclosed by what you've argued so far. My question is, and if you have a response, why isn't Eastman Kodak in the Supreme Court in plaintiff's favor on the market definition issue? Your Honor, I think that whether or not it is in their favor on the market issue, this Court's decision in Park-Ermit puts to bed any argument that could be advanced there. In Park-Ermit, this Court considered a case and that you're dealing with... We didn't overrule Eastman Kodak. You did not. I don't think we talked about it. But I think Park-Ermit is consistent with Eastman Kodak. But that's my question. Why? It is consistent with Eastman Kodak because the alleged market, both in Park-Ermit and here, is the alleged market of maintenance medications paid for by Express Script's planned sponsors. What this Court found, plain and simple, that's it. What this Court held in Park-Ermit was that that relevant market definition ignores that consumers generally have access to maintenance medication refills through other pharmacies, both in and outside the Express Script network. And just like Park-Ermit, the customers of the alleged market here are Express Script's planned sponsors. I'm sorry. And just as in Park-Ermit, the customers of the alleged market there were planned sponsors and pharmacies. And those planned sponsors, as you pointed out, are free to choose a different PBM network. Well, but Eastman Kodak at least opens the possibility that a single product or service can be a relevant product market. It does open that possibility, but I don't think... And maybe Park Inman suggests that it's to the contrary. Well, I don't think this Court has to step over what was done in Park-Ermit or would be acting inconsistent with Eastman Kodak if it found here, just as it did in Park-Ermit, that the market as pled is not broad enough to consider generally that refills can be had through other pharmacies, both inside and outside the Express Script's pharmacy network. And I think that puts it to bed for this Court. But I want to make sure, if you've got anything else to follow up, that I've not left something hanging. Judge Loken. No, well, I thought what's remarkable about Eastman Kodak is that the plaintiffs limited their claim to the aftermarket. And one can analogize refill prescriptions with an aftermarket, but it's not a comfortable fit. We agree, and again, it was not alleged or argued up until now. In closing, Your Honors, I would say, go right back to where I started. The District Court got it right here. Because the purpose of HIPAA is to protect an individual's private health information, not the pharmacy's right to get paid if they participate in a retail pharmacy network. And because there's no allegation in this case that Express Scripts has ever used the PHI information that it's been provided through the pharmacy plaintiffs for any purpose other than to fulfill the prescriptions, whether at retail or by mail dispensing, of the members consistent with their planned sponsors' programs. There's no breach of contract claim. There are no quasi-contractual claims here. And for the reasons stated by this Court and Clark Hermitt, there's no monopolization of action either. Thank you very much. Thank you, Mr. Holliday. Mr. Bowles, your rebuttal. So I've only got a moment, but I wanted to touch on three things quickly if I could. The first is the discussion that we just had about Eastman Kodak I think is apt. The complaint here alleges that the prescriptions filled outside of the network are not reasonable substitutes for prescriptions filled inside of the network because a prescription filled for a $10 copay is not a reasonable substitute for a prescription filled for $300 or $1,000. They aren't fungible. They just aren't. And so I think that you can have a distinct market here. The second point that I wanted to make is that the district court fundamentally just got it wrong on two key points, and I think they bear repeating. The first is that a significant basis for its decision was its construction of this recital provision that says that Express Scripts administers and manages prescription drug programs that include mail-order dispensing. That doesn't say that Express Scripts performs mail-order dispensing. That's just not what it says, but that's how the district court construed it. And the second thing is that in Section 2.4 of the pharmacy of the provider network or the network manual, it doesn't say that Express Scripts owns the information it receives from the plaintiffs. It says that it owns the information that it derives from processing the plaintiff's claims, not the claims themselves, not the information in the claims themselves. And the district court decided that it owned the information that plaintiffs provided to the defendant. And on these two points, which were the cornerstones of the decision below, the district court just got it wrong. Thank you. Thank you, Mr. Bowles. Thank you also, Mr. Holliday. The court appreciates both counsel's presentations to us this morning and the arguments, and we will take the case under advisement. You may be excused.